# District of Columbia
# Court of Appeals

**No. 14-CM-120**

DION M. SLATER-EL,

<div style="text-align:center">Appellant,</div>



FILED

JUL -7 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**DVM-2442-13**

UNITED STATES,

<div style="text-align:center">Appellee.</div>

<div style="text-align:center">

On Appeal from the Superior Court of the District of Columbia
Criminal Division

</div>

BEFORE:  THOMPSON and EASTERLY, *Associate Judges*; and FERREN, *Senior Judge*.

<div style="text-align:center">

**J U D G M E N T**

</div>

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that appellant's conviction for attempted second-degree cruelty to children is reversed.

<div style="margin-left:40%">

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

</div>

Dated:  July 7, 2016.

Opinion by Associate Judge Phyllis D. Thompson.

Dissenting opinion by Senior Judge John M. Ferren.

*Notice:* This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CM-120

DION M. SLATER-EL, APPELLANT,

FILED 7/7/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(DVM-2442-13)

(Hon. Marisa Demeo, Trial Judge)

(Argued November 12, 2015                    Decided July 7, 2016)

*Edward E. Schwab* for appellant.

*Seth M. Gilmore*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Samantha Trepel*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and FERREN, *Senior Judge*.

Opinion for the court by *Associate Judge* THOMPSON.

Dissenting opinion by *Senior Judge* FERREN at page 28.

THOMPSON, *Associate Judge*:    Appellant Dion Slater-El contends that the

evidence was insufficient to sustain his conviction for attempted second-degree

cruelty to children.[1]  Concluding that the evidence on which the trial judge primarily relied in finding that appellant caused a grave risk of bodily injury to his young son meets the test of "inherent incredibility" — admittedly a "very stringent test which has been met in only a tiny number of cases," *In re A.H.B.*, 491 A.2d 490, 496 n.8 (D.C. 1985) — and that the remaining evidence cannot support a finding of guilt beyond a reasonable doubt, we agree, and therefore reverse.

## I.

Appellant's conviction stems from an incident at the home of his sister, Donna Robinson, and her husband, Ellsworth Robinson.  Appellant's wife, Louisetta Koh, lived in the Robinson home along with her two children, a six-year-old daughter and a 16-month-old son.  Appellant is the biological father of the younger child.  On October 26, 2013, after appellant had brought the children back to Koh after their visit with appellant, an argument between Koh and appellant ensued when Koh informed appellant that she had made arrangements to take both

---

[1]  A person "commits the crime of cruelty to children in the second degree if that person intentionally, knowingly, or recklessly . . . [m]altreats a child or engages in conduct which causes a grave risk of bodily injury to a child[.]"  D.C. Code § 22-1101 (b)(1) (2012 Repl.).  "[Proof] of second-degree cruelty to children is sufficient to convict a defendant of attempted second-degree cruelty to children." *Smith v. United States*, 813 A.2d 216, 220 (D.C. 2002).

children to North Carolina the next day. Appellant said that he would not allow Koh to take his son. When Ms. Robinson saw that appellant and Koh were "tussling," Ms. Robinson told appellant to leave, but appellant refused and (the trial court found) shoved Robinson aside.[2] The bulk of the testimony at trial was focused on what occurred afterwards, when appellant walked over and picked up his son, who was seated in a highchair.

Ms. Robinson was the government's first witness. We describe her testimony at some length because the trial court relied on it heavily in finding appellant guilty of attempted second-degree cruelty to children. Ms. Robinson testified that appellant "grabbed" the child, who was "still strapped into" the highchair (depicted in Government Exhibit 2), "grabbed the highchair," and somehow "ended up on top of . . . Koh on the couch with the highchair and the baby[,]" possibly because appellant had tripped over the legs of the highchair. According to Ms. Robinson, appellant "had his arms around the baby" but "also had a full highchair . . . in his grasp"; Koh "was under [appellant] and the baby," while the baby was "still strapped into the . . . seat[.]" Ms. Robinson testified that appellant had "a grip on the baby where you really couldn't see the baby. . . . You

---

[2] For that conduct, appellant was charged with and convicted of simple assault. He does not challenge that conviction.

really couldn't see the baby good, unless you knew the baby was there, you wouldn't have known that he had that tight of a grip on the baby."

Ms. Robinson further testified that she and Koh kept repeating that appellant should "let go of the baby," and Ms. Robinson tried "to pull him up off the baby." After a "few minutes," Mr. Robinson, who had called 911, came downstairs and hit appellant "to get him to let go of the baby," and there was a "lot of confusion going on at that time." When the police arrived, Ms. Robinson testified, they "had this baton thing" that Ms. Robinson "guess[ed] [] they were going to poke [appellant] with[,]" but Ms. Robinson told them to stop and joined "[e]verybody [in] hollering it's a baby under there, it's a baby under there." Ms. Robinson testified that when a second officer arrived, that officer "was getting ready to mace [appellant]," but everyone again "hollered please don't use the mace, it's a baby under there." The officers tried to pull appellant off of Koh and told him to let the baby go, but appellant "said he wasn't going to do it." Appellant eventually released the baby, but, during the whole time appellant was holding the baby, the baby was "screaming" and "hysterically crying" and "was terrified."

On cross-examination, Ms. Robinson testified that while the highchair was propped up on the couch, appellant had his back toward her and never changed that

position until the police came. Ms. Robinson agreed that her view was of appellant's "back and back of his head" and that she grabbed appellant "from the back," but said that appellant's "weight was on — could have — anything could have happened at that moment actually." She added that appellant "was putting the baby at more harm than had he let the baby go, because [Koh] was also there and she had her hands on the baby, as well."[3] Ms. Robinson further testified that she didn't "know what [appellant] could see, because [she] couldn't see what he could see."

On re-direct, Ms. Robinson testified that "[appellant's] weight was on that baby. Even though he may have had the baby wrapped around -- he had his arms wrapped around the baby, the positioning of that baby between him and his wife could have caused that baby harm. . . . The weight of his body was on the baby . . . The only thing that I could see that might have even helped a little bit was the highchair. Had the baby not been in the highchair[,] the baby could have gotten really hurt badly."

---

[3] Ms. Robinson was asked whether she could "see all of that from underneath them" when Koh was on her back, the highchair was on top of her, the baby was in the highchair, and appellant was on top of them with his back and the back of his head showing. Ms. Robinson answered, "You had to be in [the] position that I was in, yes."

The government's next witness was Mr. Robinson. Mr. Robinson testified repeatedly that he "couldn't see the baby" and "didn't see the baby" or the highchair, because appellant was "right over top [of] the baby" and because the baby and Koh were both "down on the floor in front of [appellant]."[4] Mr. Robinson said that appellant "wouldn't let the baby go even after the police came" and that appellant released the baby only after the police put "a little spoon . . . [thing] under his arm" and his arm "popped up." Mr. Robinson testified that "it didn't seem like [the police action] hurt the baby" and that he did not hear the baby "do anything. . . . The baby was walking."

The government's final witness was Metropolitan Police Department ("MPD") Officer Tiffany Keenan, who responded to the 911 call on the night of the incident. Officer Keenan testified that when she and Officer Michael Rodd arrived at the scene, she heard voices yelling, "let go of the baby, get him off of the baby." Officer Keenan testified that when she entered the residence, she saw appellant "laying on top of" or "laying over top of the baby and then the baby right under him," and could see the baby face up and crying "hysterical[ly,]" "like it was very uncomfortable." Appellant's torso was "leaning over the couch" and his

---

[4] Ms. Robinson had testified that Mr. Robinson "could see that the baby is there," but Mr. Robinson testified that he "couldn't understand where the baby was."

"knees [were] on the ground." Officer Keenan then demonstrated appellant's positioning for the court, which the government described for the record: "[Officer Keenan] kneeled down on the floor bent over[,] encircling her arms in front of her." Officer Keenan stated that appellant was "more so laying on top of the baby" than cradling the baby. Officer Keenan did not see a highchair and agreed on cross-examination that Koh was not lying under appellant when the officers arrived. Officer Keenan testified that appellant "repeatedly kept saying I'm not going nowhere without my son." The officers "more than twice" asked appellant to release his son, and, when he would not comply, Officer Keenan pulled appellant's left arm, "us[ing] the reasonable amount of force necessary to . . . get him to comply." Officer Keenan could not "give . . . an estimate[d] amount of time," but said that "it took a little while to get [appellant] off." The baby was "on his back facing upward" when appellant released him. Officer Keenan noted that Koh refused medical treatment for the baby, stating that "the baby was fine."[5]

---

[5] During re-direct, Officer Keenan, making use of a juror's chair, demonstrated how appellant was holding the baby. The court described the demonstration as follows:

> I guess I don't know that one can say whether or not
> there's air [between the cushion and the officer's body],
> but certainly one could characterize what the witness
> showed the [c]ourt is her body in the area of her arms
> from the lower chest to her stomach . . . directly lying on
> top of the chair, that is making contact with the chair,

(continued…)

At the close of the government's case, the court said that it would draw an adverse inference that Ms. Robinson and Mr. Robinson "are biased against" appellant as a sanction for Ms. Robinson's having discussed with Mr. Robinson, prior to his testimony, her own testimony about whether she was biased against appellant. The court found that the discussion violated its instruction that Ms. Robinson was not to discuss her testimony with anyone before the trial was over.[6]

After the court denied the defense motion for judgment of acquittal, the defense presented three witnesses. MPD Officer Rodd testified that he and Officer Keenan responded to the Robinsons' home "within a few minutes" "from the time

---

(…continued)

> there wasn't a space visible between her body and that region and the cushion of the chair.

Observing that Officer Keenan's demonstration had her "ninety degrees pretty much bent over . . . this furniture piece," defense counsel asked the officer, "So it wasn't like [appellant] was laying flat out on top of the baby, smothering the baby, . . . right?" Officer Keenan responded that there was "nothing there [presumably, nothing in her demonstration that stood in for the baby] so . . . [she] did it to the best of [her] ability."

[6]    Appellant subsequently testified that he and his sister are "really estranged." Ms. Robinson testified that she loves appellant, but, in response to a question from defense counsel about whether appellant had "exposed [her] for making up medical conditions that did not exist" (a matter about which appellant later testified), Ms. Robinson said that appellant's account was a "boldface lie" and that she could "bring medical records showing that [appellant] was escorted from the hospital by police officers because of the things that he was doing while he was there."

the call came in." Upon arriving at the home, they saw members of the household around appellant yelling at him to let go of the baby. Appellant "had the baby facing towards him sitting in a highchair and he was holding it crouching over[,] like leaning on the couch." Asked whether appellant was "cradling the child," Officer Rodd said that he "wouldn't say cradling," as appellant "was holding the child very tightly." Appellant "seemed very agitated" and "didn't want to let go of the baby," and although the officers instructed him to let the child go, he did not do so until the officers forced him. The baby was crying hysterically when the officers entered the house, to the point where Officer Rodd was concerned about the child's well-being and safety because of "the position of [appellant] and the baby[.]" To Officer Rodd's knowledge, the child was "okay" when released. Officer Rodd testified that he did not see Koh, or any other person, under the highchair as it was lying on the couch.

Koh was the next defense witness. She testified that after appellant said he was going to take his son, appellant put "[h]is arms around the child" while the child was still in the highchair. Appellant fell on top of Koh after Mr. Robinson kept hitting appellant on the head. Koh told the court that she believed appellant, who was "crouching down" with his face toward the baby, was holding the baby "safely because he wasn't crying." She testified that the baby did not begin to cry

until the police arrived. She also testified that appellant did not refuse an instruction to let the baby go and that the police did not tell appellant to "get off the child" because they were "in the back behind him" and "ain't even know" (presumably, whether appellant was on the child). Koh did not know how many "minutes or seconds" it took for the officers to get appellant to release the baby after they arrived. She acknowledged that she yelled for appellant to let go of the baby, but testified that she "knew he was not going to hurt the baby" and denied that appellant was putting his weight on the baby.

Finally, appellant testified on his own behalf. He testified that after Koh threatened to take the children to North Carolina, he went inside the house to get his son, and Koh began yelling, "Don't take the baby." Appellant testified that his intention was to pull the child out of the highchair and then leave, but that Ms. Robinson grabbed his arm, which he snatched away (according to appellant, "the only contact [he] made with [his] sister"). Appellant said that he took the child, who was "not strapped in," out of the highchair and had the child against his chest, and that the women began pulling on the baby. Appellant thought the baby could get hurt from their pulling on him, so he "kind of held the baby more trying to get them to just stop." He looked down at the baby, who was breathing and was "just there[,]" as if he "[m]aybe . . . thought we were playing or something[.]" Mr.

Robinson appeared and began punching appellant, "for some minutes[,]" and appellant's "legs gave out and [he] just fell to [his] knees." Appellant testified that while trying to understand why the others were beating on him and punching his head while he had the baby, he walked on his knees over to the couch and buried his head, as people continued to beat on him. He was "just trying to hold the baby so he didn't get hit." Appellant, with his head buried, knew that police officers had arrived only when they "did something" to his side to get him to release the baby. The baby had no injuries, and while appellant acknowledged that he heard his daughter crying during the incident[7] (and identified her as the person crying on the 911 recording that was admitted into evidence), he testified that the baby did not cry until the police took him away from appellant.

In announcing its findings of fact, the trial court stated that notwithstanding the evidence of Ms. Robinson's bias against appellant, Ms. Robinson was a "very compelling and credible witness," who "testified with a level of detail . . . [and] demeanor that truly conveyed to th[e] court that she was telling . . . the truth about the events." As for Mr. Robinson, the court gave his testimony "less weight," explaining that "[h]is memory seemed to be more faded than one would have

---

[7] Appellant testified that he was in the process of adopting the little girl, Koh's daughter, when the incident occurred.

expected regarding the events that had occurred . . . [a]nd [he] didn't seem to remember with specificity his own action[s][.]" The court found both police officers "to be very credible witnesses" with no reason to be biased and gave their testimony "a lot of weight" despite "some inconsistencies" in the testimony. The court found Koh to be "a less credible witness," who was not "[attuned] to what was happening around her[,] perhaps because she had already been involved in both a verbal and physical altercation with her husband"[;] the court gave her testimony "less weight." In particular, the court found "not credible" Koh's testimony that the baby was not crying until after the police arrived, noting that the officers, "upon arriving on the scene while the events were still ongoing," indicated that the baby was crying.

The court also found "wholly incredible" appellant's testimony that the baby was not crying until after the police arrived. In light of Officer Rodd's testimony that the baby was still in the highchair when he arrived, the court also did not credit appellant's testimony that the baby was not still in the highchair when appellant was holding him. Citing Officer Keenan's testimony that she did not see anyone's hands on appellant when she arrived, the court did not credit appellant's testimony that he was "just being pounded and pounded and beaten and that's why he

couldn't release the baby[.]"[8]  Further, the court did not credit appellant's testimony that, during the incident, his primary concern was the baby's safety. Instead, the court found, the "driving force" behind appellant's action was his intent not to leave without the baby, and his "actions of not releasing the baby . . . continued to place the baby at greater and greater risk of harm."

The court found that the baby was strapped in the highchair shown in the photograph admitted as Government Exhibit 2.  Additionally, the court concluded:

> I do find that the defendant grabbed the baby while the baby was still in the high chair, never removing the baby from the high chair, grabbed the baby with a tight grip.  I do find that at one point the baby ended up under the upper body of the defendant leaning over -- over a couch. The defendant's weight was on some of the baby.  The baby was still in the high chair.  And so the order it is the defendant's on top, the baby next, and then the high chair, and then the couch, in that order from top to bottom with the defendant pressing down on the baby holding the baby tightly.  I do find that the baby was [exhibiting signs of distress by] hysterically crying and was terrified.

The court also found that appellant was holding his son "very tightly[,]" "in a tight grip with the son underneath his body[,] pinned between his body and the high

---

[8]  The court found, however, that Ms. Robinson tried "to physically pull [appellant] up and off the baby" and that Mr. Robinson, for several minutes, "struck [appellant] trying to get [him] to release the baby."

chair on top of a couch," a "dangerous position where the child was at a grave risk of harm for an extended period of time." The court further found that appellant did not comply with the police officers' order, given more than two times, to release the child and found it "wholly incredible" that appellant did not recognize that "these were now police officers" giving the order. Appellant's non-compliance with the officers' order, the court found, was "extremely dangerous" for "[a] baby who could do nothing to get himself out of this situation" and "who could easily be harmed[.]" The court found that:

> [The] manner in which [appellant] grabbed the baby, held the baby, continued to hold the baby in a tight grip leaning over the baby with his weight on the baby with the baby still strapped in the high chair and continuing to do so in this very dangerous and precarious position for many minutes even when the police arrived continuing to do so, despite being asked to let the baby go, it did create a grave risk of bodily harm.

After the court concluded the announcement of its findings, defense counsel asked the court to clarify its findings on several points, saying:

> If the child was in the high chair and [the chair] kind of forms a plastic frame around the child, . . . how is [appellant] able to possibly suffocate the child if the child has this plastic frame around himself[?] Even if [appellant] was close to him, it seems [the highchair] would have insulated the child from having any kind of problems.

Counsel also asked whether the court credited appellant's testimony that he fell or tripped rather than "went down on the couch intentionally[.]" The court responded that counsel's questions were "not key in any manner . . . and that's why [it] didn't focus on them." The court further responded that it did not matter whether appellant "tripped or went down on the couch on his own"; what mattered for the court was that while appellant "had the child gripped in a tight grip on top of the couch, he continued to grip that baby for many minutes[,]" "while the baby was positioned on top of the couch underneath his weight[,]" "while he was repeatedly asked to let the baby go." "[T]hat in, and of itself, caused a grave risk of harm to the baby." The court said that it was not "making a specific finding whether the child was going to suffocate," reasoning that "[t]here could have been many ways the child could have been harmed under these circumstances because the defendant refused to release the baby. So I'm not here to make a physics [finding] as to whether the chair was providing sufficient protection [in order] to prevent suffocation[.]" Accordingly, the court found appellant guilty of attempted cruelty to children in the second degree.

## II.

To prevail on a claim that the evidence was insufficient for conviction, an appellant "must establish that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *Russell v. United States*, 65 A.3d 1172, 1176 (D.C. 2013) (internal quotation marks omitted). When considering an insufficiency-of-the-evidence claim, "we view the evidence in the light most favorable to the government, giving full play to the right of the [fact-finder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Medley v. United States*, 104 A.3d 115, 127 n.16 (D.C. 2014) (internal quotation marks omitted). Almost without exception, "[t]he determination of credibility is for the finder of fact, and is entitled to substantial deference." *Bouknight v. United States*, 867 A.2d 245, 251 (D.C. 2005). "This court will not reverse a trial court's factual findings after a bench trial unless those findings are plainly wrong or without evidence to support them." *Evans v. United States*, 122 A.3d 876, 887 (D.C. 2015) (internal quotation marks and alterations omitted).

The foregoing standard is "deferential," *Swinton v. United States*, 902 A.2d 772, 776 n.6 (D.C. 2006), but it is not a "rubber stamp," *id.*, and it is by no means "toothless." *Evans*, 122 A.3d at 887. "[A]lthough a [fact-finder] is entitled to draw a vast range of reasonable inferences from evidence, [the fact-finder] may not

base a verdict on mere speculation." *Schools v. United States*, 84 A.3d 503, 508 (D.C. 2013) (internal quotation marks omitted). Moreover, "[t]he one exception to th[e] general rule [that the determination of credibility is for the finder of fact, and is entitled to substantial deference,] is if the testimony of a witness is inherently incredible under the circumstances." *Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007). The "doctrine of inherent incredibility can be invoked only when the testimony can be disproved as a matter of logic by the uncontradicted facts or by scientific evidence, or when the person whose testimony is under scrutiny made allegations which seem highly questionable in light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave." *Payne v. United States*, 516 A.2d 484, 494 (D.C. 1986) (internal quotation marks and alterations omitted). Applying the doctrine of inherent incredibility, we may conclude that testimony credited by the trial court "should have been discredited" where it "contains internal contradictions[.]" *Jackson v. United States*, 353 F.2d 862, 867 (D.C. Cir. 1965); *see also id.* at 867 n.11 (explaining that in *Farrar v. United States*, 275 F.2d 868 (D.C. Cir. 1959), the court "in effect used the inherently incredible doctrine . . . in reversing a criminal conviction rendered by a judge"); *Farrar*, 275 F.2d at 869 ("It is nearly or quite incredible that appellant could have used a knife as extensively as the [witness] said he did without her ever seeing it.

It is so nearly incredible that a reasonable inference, if not the only reasonable inference, from the testimony of the [witness] herself, is that appellant did not use a knife.").[9]

"We must reverse a criminal conviction when it is clear to us that upon the evidence a reasonable mind must necessarily have had a reasonable doubt as to guilt." *Farrar*, 275 F.2d at 870 (internal quotation marks and alterations omitted).

## III.

In this case, the trial court's determination that appellant was guilty of attempted second-degree cruelty to children was premised on the court's findings that appellant (1) held the baby, who was strapped in a highchair, in a "tight grip"; and (2) for many minutes, still "very tightly" gripping the baby, put his "weight on the baby" (or on "some of the baby"), with the child "pinned between his body and the high chair on top of a couch[.]" Appellant contends that these factual findings are clearly erroneous and "contrary to the physical evidence." We agree; we do

---

[9]  *Cf. Davis v. Commonwealth*, No. 1637-99-2, 2000 Va. App. LEXIS 612 (Va. Ct. App. Aug. 22, 2000) (reversing conviction because the victim's statements, such as her statement that the defendant "was dragging her by her feet while choking her," contained "inherent inconsistencies" and were "internally self-contradictory and do not permit reconciliation of the differences").

not defer to them because, as we explain below, the testimony on which they are based "can be disproved as a matter of logic by the uncontradicted facts[,]" *Payne*, 516 A.2d at 494 (internal quotation marks and alterations omitted), or because the findings "seem highly questionable in light of common experience and knowledge,"[10] *id.*, or are based on "mere speculation." *Schools*, 84 A.3d at 508 (internal quotation marks omitted).

We begin with the finding that appellant held the baby in a "tight grip." As noted above, the court relied primarily on Ms. Robinson's testimony, and it was Ms. Robinson who referred to appellant's "tight . . . grip on the baby" during the incident. But this and other critical parts of Ms. Robinson's testimony are internally unsupported because Ms. Robinson admitted at the outset of her testimony that "you really couldn't see the baby."[11] She also testified, without contradiction, that she was standing behind appellant, from which position she

---

[10] Our dissenting colleague asserts that only this criterion for an "inherently credible" finding is relevant, but the "can be disproved as a matter of logic by the uncontradicted facts" criterion is equally, if not more, relevant.

[11] As described above, Ms. Robinson's only testimony about the "tight . . . grip" was, "You really couldn't see the baby good, unless you knew the baby was there, you wouldn't have known that he had that tight of a grip on the baby."

could see his back and the back of his head.[12]  In addition, Ms. Robinson testified

that appellant had grabbed the highchair and had "a full high chair . . . in his grasp"

after he tripped.  Her testimony begs the question of how she could have seen how

tightly appellant was gripping the child when she was behind him, and the question

of how tightly appellant could have been holding the child when he was also

holding the highchair in which the child was seated.  Moreover, only through pure

speculation could one assume that appellant's hold on the child during the many

minutes of the incident was exactly like his hold on the child when he first

attempted to lift him out of the highchair[13] (or, as our dissenting colleague

speculates, that appellant "naturally would have been trying to tighten his hold" on

the child or to "reinforce[e] his weight on the child-in-chair" as the officers pulled

at his arm to get him to release the child).

We conclude that Ms. Robinson's testimony that appellant was holding the

child in a "tight . . . grip" was "disprove[d] . . . as a matter of logic by the

uncontradicted fact[]," *Jackson*, 353 F.2d at 867, that she was not in a position to

---

[12]  Mr. Robinson, who according to Ms. Robinson was hitting appellant on "the back of his head," similarly testified that he "couldn't see the baby."

[13]  No one has suggested that appellant's action in the moment when he attempted to lift the child out of the highchair could support a charge or verdict of attempted second-degree cruelty to children.

see (and thus lacked the capacity to perceive) appellant's grasp on the child.[14]  Not only is the trial court's finding about appellant's "tight grip" not supported by credible evidence, but also the court's decision to credit Ms. Robinson's testimony *in toto* is especially difficult to understand given the court's prior determination that Ms. Robinson was biased against appellant, and given that Ms. Robinson seemed to want to testify to more than she actually saw (and to what Mr. Robinson saw, despite his contrary testimony).

Likewise with the trial court's finding that appellant placed his weight on the baby.  Ms. Robinson (and no one else[15]) testified that "[t]he weight of [appellant's]

_____

[14]    We acknowledge that Officer Rodd testified that appellant was holding the baby "very tightly[,]" but he did so to distinguish the way appellant was holding his son from "cradling," which was how defense counsel characterized the manner in which appellant was holding the child:  "I wouldn't say cradling, he was holding the child very tightly."  Officer Rodd also testified that the child was "facing towards [appellant] sitting in a highchair and [appellant] was holding it crouching over like leaning on the couch."  It is unclear whether the officer's reference to "holding it" meant that appellant was holding the baby or the highchair; but, in either case, we find it difficult to understand how appellant could have been holding the strapped-in child very tightly if the child was actually sitting in the highchair, or if appellant was also holding the highchair itself.

[15]    Specifically, the police provided no testimony that appellant's weight was on the child.  Officer Keenan testified that appellant had his "torso leaning over the couch," and Officer Rodd testified that the child was "facing towards [appellant] sitting in a highchair and [appellant] was holding it crouching over like leaning on the couch."  The demonstration Officer Keenan provided on re-direct indicated only that appellant and his son were touching (i.e., the court found that it

(continued…)

body was on the baby." But from Ms. Robinson's admitted vantage point behind appellant, she could not have seen whether appellant's weight was on the child (or whether the child was "pinned" between appellant and the highchair). Tellingly, the first time Ms. Robinson mentioned appellant's weight, she started to say something and then appeared to check herself: "His weight was on — could have — anything could have happened at that moment actually." She did not return to the subject of appellant's weight on direct; only on redirect did she say that

---

(…continued)
could not see "space visible" between the officer's body and "the cushion of the chair"), and the officer demurred that she had done the demonstration to the best of her ability given that there was "nothing there" (such as a baby, we presume) that would have allowed her to give a more true-to-life demonstration. Moreover, although Officer Keenan testified that she saw no highchair, the court found to the contrary that the child remained strapped in the chair throughout the incident (a resolution of the witnesses' conflicting testimony to which we "must defer," *McDaniel v. Brown*, 558 U.S. 120, 133 (2010)). Thus, Officer Keenan's demonstration did not simulate the facts as the court found them to exist. No one testified that appellant was "pressing down" on the child, as the court found.

Nor was there any evidence that the child had bruises, red marks, or any other evidence of physical injury that might have followed if appellant had rested his weight on, or had tightly gripped a part of, the child's body. The government offers a third possible basis supporting the guilty verdict: emotional harm to the baby. However, while the court found that the child was "exhibiting signs of distress by hysterical crying," the court made no findings as to emotional harm. As appellant notes, the baby's hysterical crying could have been triggered by the household members' continuous yelling, Mr. Robinson's repeatedly hitting appellant, or appellant's fall after being hit. The record does not support a finding beyond a reasonable doubt that appellant's holding onto his son created a "grave risk" of emotional harm to the child.

appellant's "weight was on that baby." But, again, Ms. Robinson had already admitted that she really couldn't see the baby. She also acknowledged that she "couldn't see what [appellant] could see." Moreover, Ms. Robinson failed to mention the critical fact, observed by Officer Keenan and credited by the court, that appellant had his "knees on the ground" with his torso (according to Officer Rodd's credited testimony) "leaning on the couch," a posture which necessarily would have caused appellant's knees (and/or the couch) to bear a substantial portion of his weight[16] (and, as discussed below, that does not even take into account the frame of the highchair, which even Ms. Robinson acknowledged helped to protect the child from appellant's weight). For that reason, Ms. Robinson's testimony that appellant had his weight on the baby to a degree such that "the baby could have gotten really hurt badly" was a speculative "allegation[] which seem[s] highly questionable in light of common experience and knowledge[.]" *Payne*, 516 A.2d at 494 (internal quotation marks omitted). As

---

[16] Appellant argues that "[h]is knees could bear his entire weight." Our dissenting colleague asserts that appellant "never raised the knees-and-torso argument in the trial court," but defense counsel counsel did focus the court's attention on appellant's "prostrate position." In any event, there is no question that appellant has properly raised a sufficiency of the evidence claim on appeal, and we are required to look at all the evidence (in the light most favorable to the government) to determine whether no reasonable mind could find him guilty beyond a reasonable doubt. In conducting that analysis, we cannot disregard the testimony about appellant's body position, whether or not his trial counsel specifically called that issue to the trial court's attention.

the trial court made no finding that the child was at risk of suffocation and relied primarily on Ms. Robinson's speculative testimony about appellant's weight putting the baby at risk of harm, to the extent the court did so, its finding that appellant "create[d] a grave risk of bodily harm" for the child is not supported by credible evidence.[17]

Further, having resolved the contradictory testimony by finding that the child was strapped in the highchair throughout the incident, the trial court failed to take into account the significance of the highchair frame and harness in (as defense counsel put it) "insulat[ing] the child from having any kind of problems."[18]  As depicted in Government Exhibit 2, the highchair has side arms and (consistent with common experience) appears to have a very narrow space between the arms for a toddler-sized seat.  It also has a safety harness for securing the child in the cushioned seat.  It seems likely, and consistent with common experience, that an

---

[17]  The court's vague assertion that "[t]here could have been many ways the child could have been harmed under these circumstances" is unsupported by the record.  The court did credit the evidence that the child was crying hysterically, but, again, it seems as likely as not that this was caused by the "lot of confusion going on at that time."  As appellant emphasizes, "there were four adult members of the household [including a roomer, who did not testify at trial] who contributed" to that confusion.

[18]  The court remarked that the frame of the highchair was "not key in any manner[.]"

adult who is on his knees and is leaning over a highchair (with his torso leaning on a couch) and who is pulling toward himself a child who is strapped in the highchair would have his forward motion impeded, and his body weight propped up, by the arms of the highchair; the space between the arms appears too narrow to allow the shoulders, chest, or torso of the adult to weigh on the child.[19]  In addition, with the child strapped in the chair, it seems "highly questionable in light of common experience," *Payne*, 516 A.2d at 494 (internal quotation marks omitted), that appellant could pull the child fully toward himself.  We cannot agree with the trial court that "the plastic frame around the child" or the other features of the highchair were not important factors for the court to consider in making its finding about whether appellant was holding the child in a "dangerous and precarious position" and placed the child at grave risk of harm.[20]

As described above, in finding that appellant created a grave risk of bodily harm to the child, the trial court emphasized that appellant continued to hold onto the child "even when the police arrived" and "despite being asked [by the officers]

---

[19]  Ms. Robinson herself admitted that, even as she perceived the events, the highchair protected the child:  "Had the baby not been in the highchair, the baby could have gotten really hurt badly."

[20]  We need not defer to the unsupported legal determination that appellant engaged in "dangerous" conduct.

to let the baby go[.]" The court's ruling implies that appellant's failure to immediately release the child when ordered to do so by the police in and of itself created a grave risk of harm. However, the uncontradicted testimony was that, upon the officers' arrival, "everyone" joined in telling the officers that they should not use a baton or mace because "it's a baby under there."[21] From their position upon entering the house, the officers could see the child, and Officer Keenan testified that she addressed the situation by "us[ing] the reasonable amount of force necessary to . . . get [appellant] to comply." The officer did not describe exactly what she did (other than that she "was pulling, I believe, [appellant's] left arm"), but Mr. Robinson testified that, without hurting the child, the police put "a little spoon . . . thing under [appellant's] arm" and "his arm popped up[.]" There was no additional testimony describing the "little spoon . . . thing" or precisely how it worked.

To conclude upon the foregoing evidence that appellant's failure immediately to comply with the officers' orders amounted to attempted second-degree cruelty to a child, the trial court would have had to find that the police took action to separate appellant from the child that posed a grave risk of bodily injury

---

[21] Mr. Robinson testified that both his wife and appellant also told the officers to be careful because appellant had a back or neck injury.

to the child. However, the court made no such finding, and the record does not provide support for a finding, beyond a reasonable doubt, that appellant's non-compliance with the officers' orders placed the child at grave risk of bodily injury.[22]

## IV.

Without adequate factual support for the findings about appellant's holding his son in a "tight grip" and placing his "weight on the baby" or "pressing down on the baby"; without evidence that appellant's failure immediately to comply with the officers' orders that he release the child occasioned police action that put the child at grave risk of bodily injury; and without the trial judge having articulated (or ourselves identifying from the record) what other grave risk of harm to the child ensued from appellant's conduct, we are unable to uphold the trial court's verdict that, beyond a reasonable doubt, appellant committed attempted second-degree cruelty to children.

---

[22] We also find no "viable alternative" basis in the record to support a finding beyond a reasonable doubt that appellant engaged in conduct that caused a grave risk of bodily injury to his son. *Johnson v. United States*, 426 F.2d 651, 654 (D.C. Cir. 1970).

Wherefore, appellant's conviction for attempted second-degree cruelty to children is

*Reversed.*

FERREN, *Senior Judge*, dissenting: The majority's decision to reverse appellant's conviction for attempted second-degree cruelty to children[1] marks the first time in over five decades that the doctrine of "inherent incredibility" has been used to set aside a criminal conviction in the District of Columbia.[2] Indeed, this is the first time that this court has applied the doctrine since we became the final authority over District law after court reorganization in the early 1970s. I believe that the doctrine ill fits this record, and therefore I dissent, respectfully.

**I. Facts**

---

[1] D.C. Code § 22-1101 (b) (1) (2012 Repl.); see *ante* at 2 n.1.

[2] *See Jackson v. United States*, 353 F.2d 862, 867-69 (D.C. Cir. 1965) (trial court's determination of probable cause to arrest reversed because of fact-finding predicated on "inherently incredible" police testimony).

In this very sad case, appellant's wife, Louisetta Koh, told appellant after a heated argument that she would be taking away her daughter and their toddler son (D.S.) to North Carolina the next day. Appellant's sister, Donna Robinson, heard the ruckus and saw the couple tussling inside the front door of the Robinson house (where Ms. Koh and the children were living). Ms. Robinson told appellant to leave. He refused, grabbed the high chair with D.S. strapped into it, and a melee ensued. Appellant and Ms. Koh ended up on a couch, with Ms. Koh on her back on the bottom, appellant facing her on top, and D.S. in the middle, still in the high chair, facing his father. Ms. Koh kept demanding that appellant let go of D.S. while Ms. Robinson was trying unsuccessfully to pull him off. Ms. Robinson's husband heard screaming, called 911, then came downstairs and began to hit appellant. Even the downstairs tenant came upstairs and joined the fray.

Apparently Ms. Koh wriggled off the couch, leaving appellant – who would not let go – still hunched over the couch, enveloping D.S. in the high chair. According to Ms. Robinson, appellant had a "tight" grip on D.S. with his "weight on the baby." When two police officers arrived in response to the 911 call, one confirmed that appellant was "laying on top of the baby," who "was faced up and crying." The other officer testified that appellant was holding D.S. "very tightly" while the child was "crying hysterically." The officers "more than twice" ordered appellant to release D.S. and eventually had to use "reasonable" force "to . . . get

him to comply." The trial court found that appellant had held D.S. in a "dangerous and reckless" position "for an extended period of time" – more specifically, "for many minutes even when the police arrived[,] continuing to do so[] despite being asked to let the baby go."

## II. Standard of Review

The standard for reviewing a challenge to sufficiency of the evidence following a bench trial is well established: "[W]e consider all the evidence in the light most favorable to the government, according deference to the fact-finder to weigh the evidence, determine the credibility of the witnesses, and draw all justifiable inferences of fact."[3] We will not reverse a conviction unless "the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt,"[4] and we will not discard a trial court's findings of fact

---

[3] *Jones v. United States*, 67 A.3d 547, 549 (D.C. 2013) (internal quotation marks omitted).

[4] *Russell v. United States*, 65 A.3d 1172, 1176 (D.C. 2013) (internal quotation marks omitted).

unless they are "plainly wrong" or "without evidence to support [them]."[5] However, "if the testimony of a witness is inherently incredible under the circumstances," we will not defer to the trial court's credibility determination.[6]

As the majority acknowledges,[7] the test we use to gauge whether testimony is "inherently incredible" is "very stringent."[8] Thus, we may find testimony "inherently incredible" only when it

> [1] can be "disproved . . . as a matter of logic by the uncontradicted facts or by scientific evidence," or [2] when the "person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge, or [3] behaved in a manner strongly at variance with the way in which we normally expect a similarly situated person to behave."[9]

For the reasons that follow, I do not believe that the majority has met this "very stringent" standard.

---

[5] D.C. Code § 17-305 (a) (2012 Repl.).

[6] *Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007).

[7] *Ante* at 2.

[8] *In re A.H.B.*, 491 A.2d 490, 496 n.8 (D.C. 1985).

[9] *Payne v. United States,* 516 A.2d 484, 494 (D.C. 1986) (quoting *In re A.H.B.*, 491 A.2d at 496 n.8 (quoting *Jackson*, *supra* note 2, 353 F.2d at 867)).

### III.  The Majority's Analysis

In its analysis, the majority focuses on three interlocking trial court findings: (1) that appellant "held the baby, who was strapped in a highchair, in a 'tight grip'"; (2) that he "put his 'weight on the baby' (or on 'some of the baby'), with the child 'pinned between his body and the high chair on top of a couch'"; and (3) that he did so "for many minutes, still 'very tightly' gripping the baby."[10]  Inherent in addressing these findings is resolution of two aspects of the trial court's analysis which the majority finds problematic.  The first is the court's heavy reliance on allegedly inconsistent testimony by Ms. Robinson when describing the tightness of appellant's grip, and the severity of his weight, on D.S.  The second is the court's failure to recognize physical limitations, discernible from appellant's knees on the floor, his torso leaning on the couch, and the child's location in a high chair – all of which allegedly mitigated the gravity of the risks from appellant's grip and weight.  Based on these supposed shortcomings, the majority concludes that Ms. Robinson's credited testimony was "inherently incredible," and therefore requires rejection of the trial court's findings predicated on that testimony.[11]

---

[10]  *Ante* at 18.

[11]  *Ante* at 19-27.

At the outset, I believe it is important to emphasize what my colleagues do not deny, namely, that there *can* be a grave risk of bodily injury to a toddler who is strapped into a high chair, picked up and gripped tightly by his father, then flipped over backward onto a couch on top of the child's mother, with the father's weight on the child-in-chair for an extended period of time while the mother wriggles away and family members try – then the police use force – to make the father let go. The question here, therefore, is limited to whether there was credible evidence that appellant's grip was tight enough, his weight heavy enough, and his resistance long enough to have created that grave risk.

### A. "Tight Grip"

As to Ms. Robinson's testimony about appellant's grip on D.S., only one of the case law criteria for an "inherently credible" finding is relevant, number [2]: "allegations which seem highly questionable in the light of common experience and knowledge."[12] My colleagues find inherently incredible Ms. Robinson's testimony that appellant had a "tight . . . grip on the baby" because she also

---

[12] See text accompanying *supra* note 9.

testified that she had been standing behind appellant, where she could see only his back and the back of his head, adding that "you really couldn't see the baby[;] . . . [y]ou really couldn't see the baby good, *unless you knew the baby was there, you wouldn't have known that he had that tight of a grip on the baby*" (emphasis added). Ms. Robinson's "unless" clause, however, makes all the difference here. Ms. Robinson witnessed the entire sequence of events, including what happened *before* appellant fell on top of D.S., hiding him from view. She saw appellant grab D.S. while D.S. was strapped into the high chair and pull the child-in-chair close to his chest. She knew that D.S. was still there, strapped in as before, when appellant fell over with him onto the couch. Thus, her testimony about the tightness of appellant's grip *after* D.S. went out of view was informed by her observation of that grip *before* he went out of view, reflecting the downward pressure from the face-forward fall. Unlike my colleagues, therefore, I am not convinced that Ms. Robinson's testimony that appellant had held D.S. in a "tight" grip contained internal inconsistencies that rendered that testimony inherently incredible. Indeed, Ms. Robinson's "tight grip" testimony was all the more credible because it was corroborated by Officer Rodd's testimony that appellant "was holding the child very tightly." It was further corroborated by testimony elaborating on the family's unsuccessful efforts to physically force appellant to release his grip, as well as

Officer Keenan's testimony that a "reasonable amount of force" was necessary to make appellant let go.

Furthermore, the court's "tight grip" finding is not undermined, as the majority would have it, by Ms. Robinson's testimony that appellant had "a full highchair . . . in his grasp," not just D.S. alone. The high chair itself (no one has argued that a tray was on it) may have mitigated some of the risk of injury to D.S. – a fact that Ms. Robinson herself admitted on direct examination. ("The only thing that I could see that might have even helped a little bit was the highchair.") The trial court, however, not only was aware of that testimony but also was confronted by defense counsel's argument that the high chair's "frame" protected D.S. Nonetheless, the court concluded, in light of *all* the testimony, that appellant's grip around the child-in-chair was tight enough, when added to other risk factors, to put D.S. at grave risk of bodily injury. My colleagues and I were not present to hear the testimony; only the trial court was in a position to judge the witnesses' demeanor (including intensity), as well as their words. Under these circumstances, therefore, I see no room for us to say that the court's eyes and ears were defective in failing to find the "tight grip" testimony inherently incredible.

To the contrary, given our standard of review, I cannot conclude that the court's "tight grip" finding was "plainly wrong or without evidence to support it."[13]

## B.  "Weight on the Baby"

The majority's other reliance on "inherent incredibility" in the trial court's fact-finding negates the risk from appellant's "weight" on D.S., namely, the court's failure to recognize the mitigating effects of the high chair, coupled with appellant's weight-bearing knees on the floor and torso leaned against the couch. Straightaway I note that appellant never raised the knees-and-torso argument in the trial court, a curious omission that my colleagues downplay in accepting the argument on appeal.  Presumably trial counsel saw nothing there.

In any event, the trial court's failure to discern sua sponte the significance of posture over testimony would fall only within "inherent incredibility" criterion number [1]:  disproof of the finding "as a matter of logic by the uncontradicted facts or by scientific evidence."[14]  No scientific evidence is involved here, and, for

---

[13]  D.C. Code § 17-305 (a).

[14]  See text accompanying *supra* note 9.

me, it is much too far a stretch to say that Ms. Robinson's testimony regarding appellant's weight, on which the trial court relied, was rendered inherently incredible simply "as a matter of logic" by testimony regarding the high chair and appellant's posture. The high chair and posture testimony, on which the majority relies, did not spawn "uncontested facts" that undermined the "tight grip" and "weight" testimony with ironclad, night-follows-day logic.

In emphasizing police officer testimony that appellant had his "knees on the ground" with his torso "leaning on the couch," my colleagues conclude that a "substantial portion" of appellant's weight "necessarily" was borne by his "knees (and/or the couch)," not entirely by D.S.[15]  However, in my judgment, this knees and couch surmise – tantamount to appellate court fact-finding – does not effectively negate the trial court's record-based finding that enough of appellant's weight was "on the baby" or on "some of the baby" to cause risk.  That an unspecified, though arguably substantial, portion of appellant's weight was borne by his knees, and perhaps the couch, does not necessarily mean that an insignificant portion of his weight was on D.S. as appellant leaned with upper-body weight over the boy and chair, gripping them tightly.

---

[15]  *Ante* at 23.

What does the majority have in mind by "substantial" weight held off of D.S.? 30% ? 51% or more? What percentage of appellant's weight on D.S. was too little to help create grave risk? We are not told.

Because Ms. Robinson saw the entire chain of events that led to appellant's falling on top of D.S., she was in a position to assess whether appellant was placing his weight on D.S. She acknowledged, as noted above, that the high chair may have partially protected the child, but she emphasized nonetheless that appellant's weight (meaning from the scenario his upper body weight) was on D.S. to an appreciable extent, based on her observation of all that had happened. I see no reason why a reasonable fact-finder could not find this testimony credible.[16] The fact that neither police officer expressly testified that appellant had placed his "weight" on D.S. does not nullify Ms. Robinson's testimony. To the contrary, although the officers lacked her overall perspective, arriving well after appellant had fallen on the child-in-chair, their testimony tended to corroborate, not undermine, Ms. Robinson's observations. Recall the police testimony that

---

[16] It is true, as my colleagues point out, *ante* at 8, that the trial court noted that Ms. Robinson had violated the rule on witnesses by discussing her testimony with her husband before he testified. As a sanction, the court drew an inference that both Robinsons were biased against appellant. At the same time, however, as the majority also notes, *ante* at 11, the trial court – even in drawing the adverse inference – found Ms. Robinson to be "a very compelling and credible witness," a perception that this court has no convincing basis for discounting.

appellant was "laying on top of the baby," evidence tending to support the trial court's finding that D.S. was bearing at least some of appellant's upper-body weight.

Contrary to my colleagues' apparent premise, the trial court need not have found that all or even most of appellant's weight was on D.S. to find that appellant's weight was a factor – among others – contributing to a grave risk of bodily injury. The obvious size differential between appellant and his sixteen-month-old son lends credence to that finding.

Finally, my colleagues offer no analogous case law supporting reversal. In each case they rely on, *ante* at 17 & n.9,[17] reversal for inherent incredibility was premised on obvious evidentiary inconsistences and not, as here, on mere

---

[17] *Jackson*, 353 F.2d at 864, 867-68 (police officers' testimony that they had received tip with detailed description of appellant, allegedly possessing heroin, ruled inherently incredible because testimony was "internal[ly] contradict[ory]" and "contrary to human experience," and officers initially had arrested and searched the wrong man); *Farrar v. United States*, 275 F.2d 868, 869-70 (D.C. Cir. 1959) (testimony of complaining witness that appellant had threatened her with knife and "constantly pressed it against her" ruled inherently incredible because of complainant's repeated acknowledgment that she had been "looking at him" but never saw knife, and further because neither complainant nor her clothing was "marked by a knife"); *Davis v. Commonwealth*, No. 1637-99-2, 2000 Va. App. LEXIS 612 at *5-*9 (Va. Ct. App. Aug. 22, 2000) (series of conflicting statements and testimony by complaining witness so "internally self-contradictory" that her testimony alleging sexual assault was inherently incredible).

interpretation of coherent testimony (contradicted only by appellant himself and his wife).

## C. "For Many Minutes"

The legal significance of the trial court's findings as to appellant's "tight grip" and "weight" was intensified by the court's further finding, uncontested by the majority, that appellant persisted with pinning the child down "for an extended period of time" – "for many minutes." In fact, according to the court, appellant held on to the little boy "even when the police arrived" and "despite being asked [by the officers] to let the baby go." Eventually, according to police testimony, the officers had to use a "reasonable amount of force . . . . [I]t took a little while to get him off."

The trial court found that the risk to D.S. from this police action, necessitated by appellant's unyielding hold, contributed to the risk of bodily injury. Said the court: "This is extremely dangerous ignoring [the] police order to release the baby . . . and continuing to hold the baby. . . . Both officers testified they had to physically get him . . . off of the baby." The need for the police to use force to extricate D.S. not only indicates how tight appellant's grip must have been but also how the additional time, with additional tussling over the child, intensified the risk. Because appellant resisted for "many minutes" the force directed at pulling him off

of D.S., the court could have permissibly inferred, without speculation, that, appellant naturally would have been trying to tighten his hold while reinforcing his weight on the child-in-chair, as the child continued to cry hysterically – as much an indication of pain (another signal foretelling risk of bodily injury) as of fright.[18]

## D. Trial Court Ruling

We have said that the statute proscribes a "grave risk of bodily injury, not a risk of grave bodily injury"; thus, the factfinder must focus on the mere "likelihood of injury," not on the degree of potential injury.[19]  Consistent with that distinction, this court has intimated that "grave," in modifying risk, means "substantial,"[20] but not necessarily a risk likely to produce significant harm.  Although neither the trial court nor the majority discusses relevant definitions, I assume that both the court

---

[18]    *See Newman v. United States*, 49 A.3d 321, 325 (D.C. 2012) ("This is not a case where the trier of fact crossed the bounds of permissible inference and entered the forbidden territory of conjecture or speculation.") (internal quotation marks omitted).

[19]    *Lee v. United States*, 831 A.2d 378, 382 (D.C. 2003).

[20]    *Coffin v. United States*, 917 A.2d 1089, 1092 (D.C. 2007) (adverting to Iowa statute); *see Dorsey v. United States*, 902 A.2d 107, 113 (D.C. 2006) (referring without discussion to "grave or substantial risk").

and my colleagues have presupposed that, for conviction, there must be evidence of a "grave" or "substantial" risk of a bodily injury at least more than *de minimis*. Personally, I do not understand why a grave risk does not imply a risk of grave injury;[21] but, even if a risk, to be "grave," must portend a grave injury, not something less, I would not agree that the trial court's findings of fact essential to appellant's conviction are plainly wrong or without evidence to support them.

I turn, therefore, to the nature of the risk itself. In addressing the trial court at the end of the hearing, defense counsel raised perhaps the most likely risk and questioned whether the child could "possibly suffocate" with a high chair "frame around himself." The court replied, "I'm not making a specific finding whether the child was going to suffocate . . . . There could have been many ways the child could have been harmed under these circumstances because the defendant refused

---

[21] In the context most relevant here, "grave" means "likely to produce great harm or danger," as in "a grave mistake." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1174 (10th ed. 1993) (the edition closest in time preceding enactment of the child cruelty statute); *see* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed. 1992) ("grave" means "[f]raught with danger or harm," as in "a grave wound"). On two occasions when interpreting the cruelty statute we have relied on a dictionary definition. *See Mitchell v. United States*, 64 A.3d 154, 156 (D.C. 2013) (citing *Alfaro v United States*, 859 A.2d 149, 157 (D.C. 2004) (quoting definition of "cruel" in WEBSTER'S SEVENTH COLLEGIATE DICTIONARY 200 (1966))).

to release the baby. So I'm not here to make a physics [finding] as to whether the chair was providing sufficient protection in order to prevent suffocation . . . ."

It is unfortunate that the trial court did not indicate that, yes, suffocation was among the possible risks, for surely the so-called "physics" of the situation – tight grip and pressure from upper body weight for many minutes – suggested that obvious possibility. But the trial court's response did not appear intended to discount that risk, a risk of bodily injury that assuredly was evident (in the words of the case law)[22] "in the light of common experience and knowledge." As I understand the court's findings and judgment, therefore, the court foresaw the possibility of a variety of injurious (I'd say grave) outcomes and apparently perceived those risks to be obvious – and reasonably so. (I venture that the court would have had in mind not only suffocation but also, for example, facial abrasions, broken bones, and other crush-related internal injuries.) The fact that the risks apparently did not result in actual injury to D.S. is a fortunate outcome that in no way undermines the trial court's verdict and judgment under a statute criminalizing only "risk."[23]

---

[22]   See *supra* note 9 and accompanying text.

[23]   Appellant also challenges the sufficiency of the evidence supporting the trial court's finding that he acted with the state of mind necessary to support conviction under the second-degree child cruelty statute, *i.e.*, "intentionally,

(continued…)

## IV. Conclusion

I believe that the trial court, in crediting testimony from Ms. Robinson and Officers Keenan and Rodd (while discounting the testimony of appellant, Mr. Robinson, and Ms. Koh) did not engage in "mere speculation," as my colleagues put it,[24] to convict appellant of attempted second-degree child cruelty. The majority's two examples of "inherent incredibility" – Ms. Robinson's testimony regarding appellant's "tight grip" and "weight on baby" – fail to satisfy the statutory and case law criteria essential to withholding deference to the trial court's findings in a bench trial. That testimony is not inherently incredible based on alleged inconsistency or on alleged mitigation of the risk by the high chair or by the couch (a posture argument not raised at trial). On this record, therefore, I

---

(…continued)
knowingly, or recklessly."  D.C. Code § 22-1101 (b)(1) (2012 Repl.).  Given the credited, and in my view credible, testimony (which the majority does not challenge) concerning the duration of appellant's actions that placed D.S. at grave risk of bodily harm, I also would conclude that the trial court's finding that appellant acted recklessly was supported by sufficient record evidence.

[24]  *Ante* at 19.

cannot join my colleagues in holding that the evidence was insufficient to support appellant's conviction for attempted second-degree child cruelty.

\*\*\*\*\*

I must add that, although I cannot join with my colleagues, I am sympathetic with the outcome, if only because it is not clear to me why the government brought this case. We appear to have here a fracturing family, with a father apparently devoted to his young son and a mother apparently remorseful that appellant was on trial. In the end, moreover, although actual injury is not an element of the crime, it is clear that, despite the evident risk from appellant's behavior, the child was not harmed. All that said, I have no idea whether government forbearance, rather than prosecution, would have helped heal this family's relationships, and I have no basis, let alone prerogative, for second-guessing the prosecutor's decision-making. Moreover, I am well aware that the statute is justifiably intended to protect children by proscribing behavior that causes grave risk, before eventual harm. I write this final paragraph, therefore, with some hesitation, intending only to disclose that judges often wish they knew more of what has been going on in a case than the record discloses, especially when family distress is before us.